Merrimack, }
March 3, 1931. }

### WILLIAM L. KANN *v.* WAUSAU ABRASIVES COMPANY.

*Paskus, Gordon & Hyman* (of New York), and *Demond, Woodworth, Sulloway & Rogers* (*Mr. Woodworth* and *Mr. Gordon* orally), for the plaintiff.

*Hughes & Burns* and *DeWitt C. Howe* (*Mr. Hughes* and *Mr. Howe* orally), for the defendant.

BRANCH, J.   It will be useful to consider at the outset the only exception to the admission of evidence which has been argued by the plaintiff.

The defendant was permitted to introduce the correspondence between the parties leading up to the formation of the contract.   To the admission of these letters, sixty-three in number, the plaintiff objected and was granted a general exception.   The only ground of objection stated was "the immateriality of [the] evidence."

In the course of its findings the trial court made the following statement:

"While the terms of the contract as finally reduced to writing are not to be varied by the prior negotiations of the parties, their extensive correspondence discussing the contemplated contract is material and competent as bearing on the situation of the parties; their knowledge of the purposes and intentions of each; of the subject matter of the contract, and of what each might reasonably expect of the other in the way of performance."

At the oral argument it was asserted that the foregoing statement proved that the trial court made an illegal use of this evidence. This position is not well taken. The question of the extent to which the preliminary negotiations of the parties may be received in evidence as an aid to the construction of a written contract, received careful consideration in the case of *Weston* v. *Ball*, 80 N. H. 275, 276, 277, and it was there said: "As an aid to construing and applying a contract, it is always permissible to show the facts surrounding the undertaking, including what was said in the preliminary negotiations. 'Having themselves locked up the idea in the words, themselves must furnish the key to unlock it.' 4 Wig., Ev., s. 2465. 'The instrument to be interpreted, whatever may be its nature, should be read in the light of all the circumstances which may be supposed to have been present to the mind of its author when it was framed.' *Noyes* v. *Marston*, 70 N. H. 7, 16 . . . The modern authorities elsewhere are to the effect that the evidence should be admitted. 'If the previous negotiations make it manifest in what sense the terms of the contract are used, such negotiations may be resorted to as furnishing the best definition to be applied in ascertaining the intention of the parties. The sense in which the parties understood and used the terms of the contract is thus best ascertained.' *Keller* v. *Webb*, 125 Mass. 88, 89."

Judged by the foregoing standards the ruling of the trial court was plainly correct. He properly states that the preliminary negotiations are "material and competent as bearing on the situation of the parties." The important elements which go to make up the situation of the parties are the items of knowledge which each possesses. These are "the circumstances which may be supposed to have been present" in their minds when the contract was framed. The trial court then enumerates three points in regard to which the letters may tend to elucidate the knowledge of the parties as follows: (1) "their knowledge of the purposes and intentions of each," (2) their knowledge "of the subject matter of the contract," and (3) their knowledge "of what each might reasonably expect of the other in the way of performance."

The knowledge of the parties upon all of these points was clearly

a material element to be considered in construing their agreement within the rules laid down in *Weston* v. *Ball, supra,* and the other cases cited therein. The plaintiff's exception must accordingly be overruled. *Osgood Co. v. Claremont,* 81 N. H. 29; *Lariviere* v. *Stratton,* 81 N. H. 17. It must not be assumed, however, that the trial court's catalogue of questions upon which the correspondence of the parties may throw light is complete. As will later appear, we think that this correspondence had an important bearing upon issues of fact not specifically mentioned by the court in the passage above quoted.

The trial court found that the plaintiff had committed two material breaches of the contract: (1) by failing to pay the invoice of December 20, 1922 when it became due, and (2) by failing to give shipping orders for the material deliverable in January and February. If either of these findings is sustainable it furnishes a sufficient basis for the decree, and the soundness of the other need not be considered. Therefore, without intimating in any way that the first finding was not warranted by the evidence, we prefer to rest our decision upon the second ground stated by the trial court.

The finding that the defendant's "failure to give shipping orders was a material breach of the contract" is tantamount to a ruling that the provisions in regard to monthly deliveries or shipments were material parts of the contract, and the plaintiff contends that the trial court thus fell into error because "this court already has placed its [contrary] construction upon the language of the contract relating to deliveries." Reference is here made to the following language from the opinion in *Kann* v. *Company,* 81 N. H. 535, 539. "The contract itself provided merely for approximate monthly shipments, and so far as the deliveries in 1922 were concerned, their quantity was to be more definitely fixed after the delivery of the first hundred tons. This would clearly indicate that the provisions with respect to shipments were not of the essence of the contract. That being the case, strict compliance with those provisions would not be a prerequisite to the granting of equitable relief."

The plaintiff contends that the foregoing quotation constitutes an authoritative interpretation of the contract which definitely establishes the fact that "the provisions with respect to shipments were not of the essence of the contract." The answer to this argument lies in the fact that when the language above quoted was used the case was being considered upon demurrer to the plaintiff's bill, and for the purpose of overruling the demurrer it was only necessary for

the court to point out possible conclusions favorable to the plaintiff which might be reached by the trial court, upon the assumption that the allegations in the bill were true. No attempt to place a final construction upon the language of the contract could properly be made before the evidence had been produced and no such attempt was made in the passage above quoted. The opinion closes with these words: "But the precise remedy eventually awarded, whether specific performance or an injunction against the breach of the defendant's negative promise, must of necessity depend upon an equitable consideration of all the evidentiary facts and circumstances." With equal force it might have been said that the final interpretation of the contract must of necessity depend upon a consideration "of all the evidentiary facts and circumstances" bearing thereon. The trial court was not bound to adopt the suggested construction and was fully justified by the evidence in reaching a different conclusion.

It is true that the language of the contract with respect to deliveries is somewhat indefinite, but it does not follow from this fact that the provisions are unimportant, that the usual aids to interpretation are unavailing, or that the language cannot be given substantial effect in accordance with the purpose of the parties. When the case was here before it was pointed out, with reference to another clause of the contract, "that the difficulty regarding uncertainty has probably been overemphasized, and that 'it should not be allowed to hamper equitable relief further than necessity requires.' 3 Williston, Con., s. 1424. Reasonable certainty is all that is demanded, and that requirement is fulfilled if the meaning of the contract, taken as a whole, is intelligible to the court." *Kann* v. *Company, supra,* 541. *A fortiori* this must be true when no equitable relief is sought and a party stands squarely upon his legal rights.

Obviously the obligation of the plaintiff to take in some manner, and pay at some time for 1000 tons of garnet was the very essence of his agreement, and the correspondence of the parties, both before and after the execution of the contract, indicates clearly that the subject of deliveries and shipments bulked large in their minds.

The garnet first purchased from the defendant by the plaintiff, which was of the grade called "200 mesh and finer," was a by-product of the grinding process by which the defendant prepared this mineral for use in the manufacture of sand paper and cloth. This by-product was not produced in quantities sufficient to satisfy the wants of the plaintiff, however, and his constant effort throughout the preliminary correspondence was to obtain from the defendant a larger supply.

The inducement held out for this purpose was the promise of large orders and regular shipments. At first, he asked for prices on the coarser sizes, and as early as August 26, 1921, wrote the defendant as follows: "If you can make an interesting offer and can make a reasonable delivery, we would take it in carload lots every month or every other month, provided we could depend upon the delivery." The defendant responded with an offer to furnish 500 tons of the coarser grades during the next season. The plaintiff then asked it to consider the production of 300, 400 or 500 tons of the 200 mesh and finer size "by doing some special crushing and sizing." The defendant replied under date of September 21, 1921 with an offer to furnish 500 tons of 200 mesh and finer material during the next season at $65 per ton and wrote the plaintiff as follows: "In order to do this we must equip, and expect you to take this periodically, shipments to be taken according to your requirements for this amount within the year." After much more correspondence relative to prices and freight rates the plaintiff again wrote to defendant upon November 12, 1921, as follows: "In the meantime you might let me know what you think you could do in the way of price, if this material were produced in New Hampshire, . . . if we agree to keep you busily on it, that is, take it as rapidly as you can produce it." Under date of February 29 the defendant wrote: "We cannot figure that it would pay us to equip at that [New Hampshire] plant for less than a contract covering one thousand tons." And upon March 4, 1922, the plaintiff replied: "I believe that we will be prepared to give you a contract for 1000 tons a year, . . . This will enable you, with a prearranged amount of tonnage, to run at any or all times, or as long as necessary to produce your tonnage, if you are sure of your raw material." Finally upon March 8, 1922 the defendant in the course of a letter which suggests many of the terms of the final contract said: "we will grind this Garnet at our mine in South Danbury, N. H., as we suggested, which of course will mean the installation of the proper machinery to do so."

In the light of the foregoing correspondence the situation of the parties at the time when the contract was finally consummated may be summarized in this way: the plaintiff was in search of a large and dependable supply of manufactured garnet to meet the requirements of a potentially important trade which he hoped to develop, and from which a steady demand might be expected. The defendant owned a supply of raw material but lacked manufacturing facilities, and before incurring the expense of additional machinery required the assurance

of an immediate, adequate and regular market for its product. The plaintiff had represented that he would immediately order an adequate amount of the product of the proposed mill and take periodical deliveries thereof, thus enabling the mill to run regularly and dispose of its product as rapidly as it was made.

It was under these conditions that the somewhat elaborate provisions of the contract relating to deliveries were formulated, and with the above facts before him, it cannot be said that the finding of the trial court asserting the materiality of these provisions was unwarranted by the evidence. A more serious question would have been presented if he had decided otherwise.

The alternative position of the plaintiff is that, however the contract be interpreted, any rights which the defendant may have had under the provisions relating to deliveries were waived, "at least so far as terminating the contract was concerned." The items of conduct on the part of the defendant chiefly relied upon to sustain this position are (1) the defendant's compliance with the plaintiff's request that it store for him a portion of the material made under the contract, and (2) the following statement by the defendant in a letter dated January 9, 1923: "We do not wish to assume the position of pressing you for tonnage but want to assure you that we are willing to do what is fair to assist in the promotion and sale of this product."

It is true that under date of August 8, 1922 the plaintiff inquired how much "carrying capacity" the defendant had, and said: "It may be just possible that we can not move this as fast as we would like and it will have to be stored." To this inquiry the defendant replied that it could store "any quantity up to 1000 tons without any difficulty." Another reference to storage is found in a telegram from the defendant to the plaintiff dated August 29, 1922, as follows: "Conference Saturday did not settle shipping date on one hundred tons. Will you send instructions or payment for same. Will store goods subject to your order if you wish."

Following these communications the defendant continued perforce to store the material manufactured for the plaintiff, since it had received definite instructions to make no shipments except upon specific orders from Mr. Kann. Obviously this course of conduct compels a conclusion that the defendant assented to some relaxation of the terms of the contract regarding monthly shipments, but it does not follow that it thereby forfeited all its rights thereunder, and the evidence demonstrates clearly that the defendant's complaisance did not extend to the indefinite storage of the material under contract.

There appears to have been a stormy interview between the plaintiff and Mr. Sawyer, president of the defendant company, at Pittsburgh upon August 26, 1922 at which Mr. Sawyer expressed doubts as to whether Mr. Kann would "take any of the product" which had been made for him. And during the latter part of 1922 the defendant repeatedly pressed the plaintiff for shipping orders upon the contract basis. Thus upon August 31, 1922 Mr. Sawyer wrote: "I feel that you should arrange, at the earliest date, to give us something definite as to shipping dates on the balance of the amount of the contract, so that we can ship periodically." Upon November 17, 1922 Mr. Sawyer wrote the plaintiff as follows: "As you will comprehend, we are very anxious to move these goods on account of the capital involved and tied up at this time. We, therefore, would ask if you cannot give us shipping instructions to start us off on the resumption of shipments on this arrangement." Under date of November 29, 1922 Mr. Sawyer wrote: "You ought to make some arrangements to get the tonnage under the contract up to date so that we can realize on the expense that we have been put to and turn over the money tied up."

Mr. Kann, in his replies, did not suggest that the terms of the contract had been waived. On the contrary he wrote upon August 28: "It must be distinctly understood that the contract between us must be kept up in good faith and must be lived up to by both parties." In his letters he attempted rather to place the blame for such delays as had occurred upon the defendant. In short it is plain that while defendant's conduct in storing material for the plaintiff is consistent with a willingness on its part to do what was "fair to assist in the promotion and sale of this product" it does not compel the conclusion that there was a "complete" waiver of the defendant's rights in regard to deliveries, as the plaintiff claims, or that the plaintiff was thereby relieved from his substantial obligations under the contract.

The plaintiff attaches extraordinary importance to the passage in defendant's letter of January 9 above quoted. He says in his brief: "Even if the plaintiff's performance were short of strict compliance, there was on January 9 a complete waiver by the defendant. The situation up to this point is obviously within the language of this Court when it said in this case: 'Unless the buyer commits a material breach, the seller is not excused from the obligation to perform further; and if the seller knowingly accepts defective performance, or accepts further performance after he is aware that a breach has been committed, such conduct will operate as a waiver of his right to refuse to go on with the contract' . . . Moreover, the defendant by its complete

and even cheerful acquiescence in whatever the plaintiff had done or failed to do up to this point (January 9, 1923) gave the plaintiff abundant reason, if any were needed, for continuing in the belief that neither deliveries nor payments were vital to a continuance of his contract rights."

If the defendant had indeed manoeuvred itself into a position where it could no longer insist upon either deliveries or payments it would seem plain that its ascertainable rights under the contract had been reduced to the vanishing point. We do not think, however, that the letter of January 9 had the latent potency which the plaintiff would ascribe to it. Counsel overstate its effect when they say that there was on January 9 a "complete" waiver by the defendant. It seems difficult to spell any waiver, much less a complete waiver of any legal right which the defendant possessed, out of the somewhat grandiose statement that "we do not wish to assume the position of pressing you for tonnage." The expression of this wish was not equivalent to a denial of the possibility that the defendant might at some time be forced to press the plaintiff for tonnage, nor an assurance that such a step would never be taken. Probably the plaintiff does not intend to suggest that any waiver was implied in the defendant's expansive assurance of willingness to coöperate in the advancement of their common interest. Certainly such a suggestion could not be taken seriously.

The quotation from the former opinion in this case seems equally inconclusive. It cannot be said that the defendant had knowingly accepted "defective performance." Defective performance there had been beyond doubt, but it had not been accepted by the defendant. On the contrary, all prior defaults had been the subject of a compromise. They had been temporarily and conditionally adjusted by the invoice of December 30, 1922. The exculpatory effect of this compromise was obviously conditioned upon the fulfillment of its terms, and a failure to execute the compromise would remit the parties to the position which they occupied before it was agreed upon, and any right to relief by way of rescission or damages which may then have been in existence would be revived. *Gowing* v. *Thomas*, 67 N. H. 399.

It may well be that upon January 9, 1923 the defendant was not in a position where it could summarily rescind the contract by reason of the plaintiff's past defaults. It is evident that during the early stages of the operations under the contract the defendant did not seek to enforce its full rights as to shipments and payments. There was some partial and temporary waiver of complete performance by the plaintiff; but the repeated requests of the defendant for ship-

ping orders designed to put deliveries on the basis contemplated by the contract contained a clear intimation that promises would some day cease to be a satisfactory substitute for orders. That day arrived upon February 9, 1923 when the defendant's president, Mr. Sawyer, was moved to write the plaintiff a letter which is of vital importance in this case.

In this letter the defendant first declines to allow a discount taken by the plaintiff without right on an invoice dated December 19, 1922. It then expresses disappointment at the non-payment of the invoice of December 30. It calls attention to the fact that no shipping orders have been received in January or February "under the terms of the contract whereby periodical shipments or payments were to be made." It refers to a proposed trip to South America by Mr. Kann "as not being favorable to the sale of the garnet" and warns him that "unless this contract is carried out more closely to its terms, we must look elsewhere for an outlet for the product which we have made up for you." It suggests that Mr. Kann may wish to cancel the contract on account of other affairs, and continues: "I feel that immediate steps should be taken to arrange for the sale of this product made up for you, if you cannot take it."

This letter obviously marked a new stage in the relationship of the parties and no one perceived this more clearly than the plaintiff, whose reply indicated, as his counsel have well said, that "it was written by a man who was tremendously in earnest and whose emotions had been vigorously stirred by the defendant's suggestion that the contract be terminated." Although politely phrased, the defendant's letter clearly indicated its extreme dissatisfaction with the plaintiff's operations under the contract. It effectively dissipated any impression which the plaintiff may have had that shipping orders for January and February tonnage would not be insisted upon. It gave him distinct warning that unless he observed more closely the obligations imposed upon him by the contract his rights thereunder would be terminated, and offered him a chance to retire gracefully by canceling the agreement. It clearly apprised him of the fact that the defendant was already considering the necessity of securing other customers for the material on hand.

With this ominous letter before him the plaintiff should have understood that the only sure way of safeguarding his contract rights was to pay the invoice of December 30 and give the defendant substantial shipping orders so as to avoid any default for the months of January and February. He did neither of these things, but instead, as the

defendant appropriately says, "there came a long, tiresome letter with excuses, reviews, criticisms of the defendant," which was well calculated to become the starting point of a correspondence which would prolong indefinitely the period of uncertainty provided the defendant saw fit to debate with him the claims therein set up. The defendant, however, refused to be drawn in this manner and the letter remained unanswered. The plaintiff complains bitterly of this and says he does not see how "the hypothetical reasonable man could escape the conclusion . . . that Mr. Kann was entirely justified in awaiting the defendant's reply before remitting." The answer to this suggestion is sufficiently indicated above. No shipping orders came during the balance of the month of February. March 2 passed without the payment of the invoice of December 30 and upon March 6 the defendant notified the plaintiff that the contract was at an end.

The situation at this time might be found to be as follows. No shipping orders had been received by the defendant since December 19. The contract had only one month more to run. During the previous eleven months the plaintiff had taken, according to his own figures, only 229 tons under a contract calling for the delivery of 1000 tons within twelve months. The possibility that he would during the remaining month accept delivery of the balance of 771 tons seemed remote. The plaintiff's other business affairs prevented his giving proper attention to this enterprise. His disposition to do so might be regarded as doubtful in view of a statement made by him to Mr. Sawyer that he would not have made the contract if he had known of the South America timber business in which he had become involved. The defendant had for a time permitted many departures from the terms of the contract, but had subsequently been increasingly insistent that the material on hand be moved. Upon February 9 it had intimated clearly to the plaintiff that he could not rely upon a continuance of past indulgences. The plaintiff's default upon March 2 became "so substantial and important as in truth and fairness to defeat the essential purpose of the parties." *Helgar Corporation* v. *Warners Features*, 222 N. Y., 449, 453. The defendant was therefore justified in rescinding the contract. The fact that other inferences might be drawn from the evidence does not affect the validity of the foregoing conclusions.

In the second division of his argument the plaintiff invokes the well settled rule that a party who is himself in default of performance cannot rescind. His first claim *i. e.* that the defendant was in default because it failed to give him notice of the amount of ore available in

its mine, the capacity of its mill and the cost of operation, presents no difficulty. We need not consider the cogent argument of the defendant that the agreement to furnish information was ancillary to the five year option, which did not become effective until April 1, 1923 and after "successful deliveries" under the original contract had been completed, and hence, that the stipulated information was not due until April 1. It is sufficient to say that the evidence amply supports the finding of the trial judge that "there was a substantial compliance in this respect with the terms of the contract."

The plaintiff was a mining engineer. He visited the defendant's mine in August 1922 because, as he expressed it, "I must see what you have there, must know what you are doing and what we can depend on." He was then shown everything he desired to see. His inspection of the mine satisfied him, and he so stated, that there was an ample supply of ore available to meet the requirements of the contract for the option period of five years. He saw the defendant's mill in operation and its capacity was apparent to him. The defendant notified him upon November 29, 1922 that it would be able to supply "1000 tons, approximately, out of next years production." And upon January 13, 1923 notified him that after going carefully over its costs it could offer "this 1000 tons at the same price, namely $45.00 per ton." The correspondence does not indicate that the plaintiff ever had any serious doubts as to the capacity of the defendant's mine or mill, but he did frequently and pointedly inquire how much of the product the defendant would require for its own wants at Wausau. The contract did not bind the defendant to give this information.

The plaintiff's second claim of default on the part of the defendant, namely, that it committed a breach of the contract by making a sale to the Ford Motor company may well have presented to the trial judge a more difficult question of fact, but his conclusion is similarly sustainable upon the evidence. The circumstances under which this transaction took place might be found to be as follows:

On or about February 15, 1923, Mr. Sawyer, the defendant's president, went to Detroit for the purpose of opening a branch office and warehouse for the sale of its sand paper and cloth products in that territory. At this time he had no knowledge that any of the plaintiff's sales of garnet for use in the manufacture of plate glass had been made to the Ford company, nor did he have any knowledge as to the price at which this material had been sold to plate glass manufacturers. He was at this time much dissatisfied with the status of affairs

under the Kann contract and had good reason to believe that the plaintiff would not perform his part of the agreement. He had accordingly made up his mind to terminate it if the plaintiff failed to pay the invoice of December 30 when it became due, or failed to send in shipping orders for the material due for delivery in January and February. The agent employed by the defendant in Detroit was one Sheehan who had formerly been an employee of the Ford company, and through him Mr. Sawyer obtained entrance to the Ford factory for the purpose of observing their so-called continuous process of making glass "which Sheehan said was absolutely new." During this visit he saw "in the chemist's room" a large number of samples of garnet and then learned for the first time that Mr. Kann had made sales of this material to the Ford company for use in smoothing plate glass. In response to an inquiry he disclosed the fact that some of Mr. Kann's material came from the defendant's mine. He did not recognize any of the samples which he saw as Wausau garnet.

A day or two later he arranged with an official of the Ford company to ship to him 6000 pounds of Wausau garnet, purely for testing purposes, at a price of $70 per ton, and agreed provisionally upon a price of $75 per ton for future supplies to be furnished after March 1st. He clearly informed the Ford company, however, of his relationship with Mr. Kann and stipulated definitely that if the latter carried out his contract obligations the defendant would not sell the Ford company any garnet for use in the manufacture of glass.

After the defendant's attempted rescission of the contract it sold large quantities of garnet to the Ford company.

It seems plain that the evidentary facts above set forth, most of which were specifically found by the trial court, furnished an adequate basis for its final conclusion which was as follows:

"I find that the defendant took the Ford orders in good faith for the purpose of protecting itself if the contract was terminated and with no intention of violating the contract but on the contrary, that the defendant intended to save the plaintiff's rights up to the first of March, at which time the defendant expected the contract would either be in force or terminated; that the negotiations with the Ford Company and the making of a sample shipment was not a material breach of the contract."

Since the essential findings of the trial court are supported by the evidence the order here must be

*Exceptions overruled.*

All concurred.